*119 Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
“¿Se ha empaquetado o no está empaque-tado?”
Leopoldo Figueroa Carreras,
Delegado a la Convención Constituyente
¡Qué lástima! Este Tribunal, como foro de última ins-tancia donde se atienden los asuntos más acuciantes que aquejan al país, debía ser un recinto para la discusión se-rena, abierta, ejemplarizante, racional, imparcial y equili-brada, y sin ataduras de clase alguna. Especialmente, cuando la discusión afecta directamente el desempeño y funcionamiento del propio Tribunal.
Castán nos recuerda que “[e]s obvio ... que no basta que se proclame en una Constitución escrita el principio de se-paración de poderes o la autonomía del Poder judicial para que un país tenga auténticas libertades y para que sus jueces gocen de efectiva independencia”.(1) Se necesita para su garantía eficaz, de hombres y mujeres valientes, indoblegables ante intereses, entidades o propósitos que resulten extraños al fin mismo de la Justicia, y que tengan capacidad de acción. Se necesita, al fin y a la postre, de Jueces y Juezas que sepan encontrar en la Constitución, las leyes y los postulados fundamentales de Justicia, la respuesta a cualquier controversia o asunto ante su consi-deración y no, en el vaivén de las olas. ¡Esto es lo que todos hemos perdido hoy!
Porque creo profundamente en lo anterior y porque res-peto lo que ha representado esta Institución para la vida democrática de nuestro país, no puedo, en conciencia, ava- *120 lar con mi voto el asalto que perpetra una exigua mayoría de este Foro a la Institución que juraron defender contra todo enemigo interno o externo. Sabemos quién pierde. Pierde la confianza de nuestros conciudadanos en la Judi-catura como guardián imparcial del Estado de Derecho.(2) La aceptabilidad de la ciudadanía de nuestros dictámenes y de nuestra propia legitimidad, sólo es posible en la me-dida en que ésta confíe en nuestra imparcialidad.
La historia se encargará de pasar juicio y adjudicar res-ponsabilidades sobre los integrantes del “nuevo” Tribunal. “Nos atrevemos a pronosticar que el dictamen no será muy elogioso y favorable a menos que prontamente se realice [sic] que el compromiso que se contrajo al juramentar el cargo lo fue únicamente con la justicia, la verdad y lo que es correcto en derecho.” Berberena v. Echegoyen, 128 D.P.R. 864, 930 (1991) (Rebollo López, J., Op. disidente).
r — l
Hoy nuestro Tribunal Supremo, es decir, la entidad que perdura y no los integrantes que lo componen temporera y accidentalmente, sufre una afrenta sin precedentes. Se uti-liza el mecanismo extraordinario provisto en la Sección 3 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, para aumentar el número de miembros de este Tribunal, sin que este asunto se haya mencionado y mucho menos discutido o deliberado en el Pleno del Tribunal por todos los Jueces que componen su plantilla.
En otras palabras, los miembros que avalan esta Reso-lución nunca antes habían planteado la necesidad de bus-car mecanismos para atender la alegada “pesada carga”, que se intima, pesa sobre nosotros y sobre la administra- *121 ción de la justicia en el país. El contenido de la Resolución que se certifica hoy no se discutió antes de circularse, como tampoco después. La entrelinea de la Resolución y el pro-ceder de los miembros del “nuevo” Tribunal, parece sugerir que ello es innecesario, pues cuatro es más que tres. Es decir, prima en este Foro no el Imperio de la Ley, sino el Imperio del Poder.
Esta forma de actuar, a oscuras y en tinieblas, a espal-das del seno del Tribunal y escuchando sólo las propias voces y acallando la contraria, deslegitimiza la Resolución que hoy se certifica. ¿Es éste el prototipo de juez al que aspiramos los puertorriqueños?(3) ¿Es ésta la forma más idónea de resolver las controversias, escuchando sólo una parte, la que piensa igual que yo? ¿Qué puede esperar el ciudadano común que tiene una queja legítima frente al Gobierno? ¿A qué obedece la ausencia de discusión abierta, franca y libre? ¿Por qué se rehúye poner sobre la mesa la realidad del trabajo pendiente ante esta Curia? ¿A qué se le teme? ¿A que aflore la verdad? ¿Es que la verdad resulta inconveniente para los designios de la mayoría?(4)
El proceder mayoritario no tan sólo es contrario a las normas más elementales de urbanidad, sino que da al traste con uno de los presupuestos o imperativos de cual-quier foro colegiado y, por lo tanto, de la justicia apelativa, a saber: que las determinaciones que se toman son el re-sultado del trabajo colaborativo y colegiado, luego de una *122 ponderación individual. (5) La falta de respeto hacia esta Institución y hacia el país que trasluce de este proceder, pone de manifiesto ya el hecho de que no sólo es la Demo-cracia puertorriqueña la que marcha por “desolado y escar-pado camino”, sino que a ésta se le ha unido el Tribunal Supremo, es decir, el Poder Judicial. Suárez Cáceres v. Com. Estatal Elecciones, 176 D.P.R. 31 (2009) (Op. disi-dente de la Juez Asociada Rodríguez Rodríguez).
HH I — I
En su Resolución, los miembros del "nuevo” Tribunal —cuya experiencia combinada en este Tribunal no llega a un lustro— aseveran que el aumento en el número de jue-ces es necesario para paliar un supuesto atraso en los tra-bajos del Tribunal y se propone, como mecanismo para fa-cilitar su funcionamiento, que éste se opere en salas.(6)
El Juez Presidente Señor Hernández Denton, en su opi-nión disidente, ha desmantelado la falacia sobre la cual se asienta la petición que le hacen cuatro miembros de esta Curia a la Asamblea Legislativa y al Gobernador, el ale-gado atraso. El “atraso” es, como vimos, autoinfligido. No creo necesario, entonces, abordar este aspecto de la Reso-lución que hoy se aprueba. Me habré de referir a otros asuntos que se plantean en esta petición.
Considero conveniente comenzar repasando somera-mente cuál ha sido la composición del Tribunal a través de su historia. Ello nos permitirá ubicar en su justa perspec-tiva el alcance de la determinación que hoy adoptan cuatro miembros del “nuevo” Tribunal.
*123 En 1898, al cambio de soberanía, la Audiencia Territorial de Puerto Rico, precursora del Tribunal Supremo, es-taba compuesta por siete magistrados, incluyendo su presidente. Véanse: J. Trías Monge, El sistema judicial de Puerto Rico, Río Piedras, E.D.U.P.R. 1978, pág. 48; L. Rafael Rivera, La justicia en sus manos: historia del Tribunal Supremo de Puerto Rico, San Juan, Editorial Santillana, 2007, pág. 32. En octubre de 1898, el general Brooks, primer gobernador militar en la Isla, abolió el Tribunal de lo Contencioso Administrativo y dispuso que sus deberes y funciones se transfirieran a la Corte Suprema de Justicia.
De esta forma se creó un Tribunal Supremo “a imagen y semejanza de los conocidos en los estados federados, aun-que sin alterar por el momento su naturaleza de corte de casación”. Rivera, op. cit., pág. 39. Véase, además, C. Delgado Cintrón, Derecho y colonialismo: la trayectoria histó-rica del derecho puertorriqueño, Río Piedras, Ed. Edil, 1988, pág. 156 esc. 24. En diciembre de ese año, el general Brooks fijó en siete Jueces la composición del Tribunal Supremo. Un año más tarde, el general Davis emitió una nueva orden general disminuyendo a cinco el número de magistrados que componían el Tribunal Supremo. Rivera, op. cit., pág. 50.
El número de Jueces del Tribunal permaneció inalte-rado durante la primera mitad del siglo XX. Ello así, no obstante varias solicitudes del propio Tribunal, incluyendo una petición ante un subcomité del Comité de lo Judicial del Senado de Estados Unidos, para que se aumentara el número de sus miembros a siete, por ser éste el número más idóneo para operar. J. Trías Monge, La estructuración del poder judicial en la Constitución de Puerto Rico, 46 (Núms. 3-4) Rev. Jur. U.P.R. 611, 623 (1977); Resolución del Tribunal de 26 de julio de 1952.
Con la aprobación en el Congreso de Estados Unidos de la Ley de Constitución y Convenio de 1950, mejor conocida como la Ley 600, comenzó el proceso que llevaría al pueblo *124 de Puerto Rico a aprobar su Constitución en una Asamblea Constituyente. En ésta se dejó establecida la forma del actual sistema judicial en Puerto Rico. La Comisión de la Rama Judicial ante la Convención Constituyente tuvo ante sí diversas propuestas para la estructuración del poder judicial. El consenso general era que se debía fijar el nú-mero de jueces en siete. Trías Monge, El sistema judicial, op. cit, pág. 119. Trías Monge nos señala que en el seno de la Convención Constituyente, “[t]anto el sector socialista como los sectores republicanos favorecían un Tribunal Supremo compuesto de siete jueces”. (Escolio omitido.) Id., pág. 118.
Ante la Comisión de la Rama Judicial de la Convención Constituyente “comparecieron los abogados de Puerto Rico por su comisión del Colegio de Abogados, los jueces de dis-trito de la isla por la asociación que ellos tienen consti-tuida, y varios jueces del Tribunal Supremo, y todos ellos estuvieron unánimes, en que el Tribunal Supremo debe es-tar integrado por un juez presidente y seis jueces asociados”. 1 Diario de Sesiones de la Convención Consti-tuyente de Puerto Rico 519 (1961). El propio Juez Presi-dente de aquel entonces, don Roberto H. Todd, se expresó a nombre del Pleno del Tribunal en ese mismo sentido. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, E.D.U.P.R., 1982, Vol. 1, pág. 91. Finalmente, la Escuela de Administración Pública en su informe reco-mendó que se fijara el número de Jueces en siete, pues este número, lejos de ser novedoso, era el criterio que predomi-naba en la jurisdicción estatal norteamericana. Escuela de Administración Pública de la Universidad de Puerto Rico, La nueva constitución de Puerto Rico: informes a la Con-vención Constituyente, San Juan, Ediciones de la U.P.R., 1954, pág. 465.
A pesar del consenso existente sobre cómo debería estar conformada la plantilla del Tribunal, la Convención Cons-tituyente determinó que este cuerpo estaría compuesto por *125 un Juez Presidente y cuatro Jueces Asociados, que como hemos visto, era su configuración en ese momento. ¿Por qué la Convención Constituyente desoyó lo que era una propuesta que gozaba de amplio respaldo en la comunidad jurídica y no fijó en siete la composición del Tribunal, op-tando por dejarlo en cinco y proveyendo en vez un meca-nismo que permitiese que fueran éstos quienes solicitaran el aumento a siete? La respuesta es sencilla: por respeto a la independencia judicial. La mayoría de los Constituyen-tes entendía que no se debía dar la impresión de que per-sonas ajenas al Poder Judicial —los políticos— imponían su criterio sobre cómo debía quedar configurado el más Alto Foro Judicial. Es por ello que se optó por mantener el mismo número de Jueces que en ese entonces lo componían —cinco— y establecer un mecanismo para que fuesen los propios jueces quienes solicitaran modificar su composi-ción, lo que pasó a ser la Sección 3 del Artículo V de la Constitución, supra. Trías Monge, La estructuración del poder judicial, supra, pág. 625.
Don Jaime Benitez, con la claridad que le caracterizaba, explicaba: “Hay una cierta germanidad en todo este capí-tulo [el Artículo V de la Constitución] porque estamos ha-blando de un concepto básico que es el concepto básico de la independencia judicial y de la responsabilidad política frente a esa independencia judicial .... Quiero decir tam-bién en este mismo punto ... que esta disposición de que no podrá variarse el número de los jueces a menos que éstos lo soliciten, es una prueba clara del deseo de evidenciar, hasta el último extremo, la indisposición mayoritaria para intervenir con el poder judicial.” (Énfasis nuestro.) Diario de Sesiones, supra, pág. 525.
En otras palabras, la disposición que hoy invocan los cuatro miembros del “nuevo” Tribunal para aumentar la plantilla de este Tribunal —Sección 3 del Artículo V de la Constitución, supra— se aprobó con el fin de impedir que las otras dos Ramas de gobierno pudieran entrometerse en *126 las labores de la Rama Judicial, contaminando así el pen-samiento crítico e independiente que tiene que reinar en esta Curia. Al sostener la necesidad de la referida cláusula, don Ernesto Ramos Antonini expresó que
... s[í] es muy grave que ese poder judicial pueda estar sujeto a las maquinaciones del Ejecutivo o del poder legislativo, que puedan en un momento dado, perdonen el uso de la palabra, “empaquetar” al Tribunal Supremo, que es el más alto tribunal de última instancia en Puerto Rico. Y el pueblo nos dijo que quería que ahí hubiera en la constitución una cláusula mediante la cual el poder judicial no pudiera ser “empaqueta-do” en ningún momento de su historia por razones políticas, o beneficios de cualquiera otra clase, que pudiera poner en peli-gro las garantías consignadas en la propia constitución. Y si el pueblo, al aprobar esa cláusula que impide la “empaquetadu-ra” del poder judicial, así nos instruye para su seguridad y su garantía, nosotros les decimos a ustedes que en eso no podemos ceder porque eso es un mandato de carácter grave, en que el pueblo quiere estar protegido contra toda “empaquetadura” del poder judicial. (Enfasis nuestro.) Diario de Sesiones, supra, pág. 552.
El entonces delegado, don Luis A. Ferré, también mos-tró su apoyo a la inclusión de la disposición diciendo que “[t]ambién creía que esto era una salvaguardia para evitar que, en connivencia con el ejecutivo, pueda el poder legis-lativo variar el poder judicial por cuestiones de política partidista, para beneficio del partido que estuviera en el poder en ese momento, ya que el mismo Tribunal Supremo no iba a presentar un aumento en sus jueces para variar la función del poder de ese tribunal, ya que esto es una cosa incompatible”. (Enfasis nuestro.) Id., pág. 543. ¡Qué lás-tima que no exista en estos momentos entre los integran-tes del “nuevo” Tribunal esa misma altura de miras!
Aprobada la Constitución, como se esperaba, el seno del Tribunal le solicitó de la Asamblea Legislativa unánime-mente que se aumentara su composición a siete Jueces. Véanse: Resolución del Tribunal de 26 de julio de 1952; Ley Núm. 2 de 4 de agosto de 1952 (1952 Leyes de Puerto Rico 115).
*127 Fue ésa la primera vez que se utilizó la disposición consti-tucional que regula la modificación del número de los Jue-ces de este Foro. Pero distinto a lo que ocurre ahora, ese acto fue, más que nada, un ejercicio de independencia judicial. A partir de entonces, el Tribunal ha estado com-puesto por un Juez Presidente y seis Jueces asociados, con excepción del periodo de 1961-1975. Véase discusión, infra.
Recapitulando, el anterior recuento sobre la fijación del número de Jueces del Tribunal Supremo en 7 pone de ma-nifiesto sus hondas raíces históricas. No fue escogido al azar. Es el número que mejor responde a las necesidades de eficiencia y transparencia de un foro de última instan-cia, tal y como lo reconoce la Escuela de Administración Pública en su informe a la Convención. Por otra parte, la disposición que provee para modificar el número de Jueces se aprobó por los miembros de la Convención Constitu-yente como un mecanismo para garantizar la independen-cia de la Rama Judicial de las ramas políticas de gobierno. Difícilmente aquellos hombres y mujeres de bien, pudieran concebir como una realidad, que el empaquetamiento pro-viniese de adentro, de los que juraron, al vestir la toga, que serían los principales guardianes de la independencia judicial.
H-i U_J
A. En el sistema jurídico estadounidense, bajo cuyo es-quema se ha basado el Artículo V de nuestra Constitu-ción,(7) se ha considerado extensamente el asunto de cuál debe ser la composición apropiada de un tribunal apela-tivo, particularmente uno de última instancia. Sobre este *128 asunto se ha señalado que una composición de 7 Jueces constituye la estructura numérica más típica y satisfacto-ria entre los tribunales supremos estatales. Véase American Bar Association, Standards Relating to Court Organization, 1990, págs. 39-40 (“The number most common and generally satisfactory is seven”); Dept, of Justice, Bureau of Justice Statistics, State Court Organization, 2004, pág. 7 (2006) (“The most common arrangement is a seven judge COLR [court of last resort], found in 28 states and in Puerto Rico”); PL. Murray, Maine’s Overburdened Law Court: Has the Time Come for a Maine Appeals Court?, 52 (Núm. 1) Me. L. Rev. 43, 57 (2000) (“The optimal number of judges for a state supreme court is generally considered to be seven”); G.B. Cope, Discretionary Review of the Decisions of Intermediate Appellate Courts: A Comparison of Florida’s System with those of the other States and the Federal System, 45 Fla. L. Rev. 21, 27 (1993) (“The most common number of justices in the state supreme courts is seven”).
Según explica la División de Administración Judicial del American Bar Association:
A supreme court should be constituted of an odd number of judges, so that its decisions can be reached by majority vote. The number most common and generally satisfactory is seven. This facilitates the working relationships required to establish concurrence of opinion on difficult legal questions, while at the same time being large enough to provide breath of viewpoint and the personnel to prepare the opinions that are the principal work product of appellate courts. American Bar Association, op. cit., pág. 39.
Consecuente con este criterio, una notable mayoría de los tribunales estatales de última instancia están com-puestos por 7 Jueces o menos (28 estados tienen 7 Jueces; *129 17 estados tienen 5 Jueces). Únicamente 5 estados(8) si-guen el modelo de 9 Jueces existente en el Tribunal Supremo federal.(9) Véase National Center for State Courts, State Court Statistics: An Analysis of2007 State Court Caseloads, págs. 92-93 (2009); Dept, of Justice, Bureau of Justice Statistics, State Court Organization, 2004, págs. 12-14.
Vemos así, como la plantilla de este Tribunal es la plan-tilla típica de la mayoría de las cortes supremas estatales. Incluso, valga señalar que estados tan poblados como California (sobre 36 millones de habitantes)(10) y Nueva York (sobre 19 millones de habitantes(11) tienen foros de última instancia compuestos por 7 Jueces aun cuando el número de casos presentados para ambas jurisdicciones durante el 2007 (8,984 en California y 3,770 en Nueva York) excedió por mucho los 1,276 casos que este Tribunal recibió du-rante el año fiscal 2006-2007.
Por otro lado, las 5 jurisdicciones estatales (Texas, Washington, Alabama, Oklahoma y Mississippi) que no siguen la composición típica de 7 Jueces, o menos, prevaleciente en el 90% de los estados (45 de 50) difieren marcadamente de Puerto Rico, bien con respecto al volumen de casos pre-sentados, el tamaño de la población que atienden, o el sis-tema de revisión apelativa existente.(12)
*130 Valga aclarar aquí y ahora, brevemente, lo siguiente: la mayoría hace referencia en su Resolución a un estudio que alegadamente justifica los cambios propuestos en la plan-tilla del Tribunal, invocando la experiencia de Mississippi. Véase la resolución mayoritaria, In re Solicitud Aumentar Núm. Jueces TS, 180 D.P.R. 54, 75 (2010). Lo cierto es que la mayoría citó aisladamente una oración en la que se dis-cute una investigación cuantitativa sobre la capacidad de producción de los tribunales de última instancia estatales en relación con el número de Jueces que los componen. Véase V.E. Flango, State Supreme Courts Opinions as Law Development, 11 J. App. Prac. & Process 105 (2010). Sin embargo, la mayoría obvió mencionar al editar el texto, una de las ideas centrales del artículo. Hace más de treinta años, un grupo de académicos concluyó que publicar un gran número de opiniones sin la debida deliberación es no-civo para el desarrollo del Derecho, ya que tal proceder redunda en una merma en la calidad del contenido de las decisiones publicadas. íd., pág. 110. A esos efectos, el autor concluye que
... [I]f law development is the goal ... it is not appropriate to evaluate productivity in courts of last resort based upon opinion production or to rate states on number of opinions per justice, just as it would not be appropriate to evaluate state legislatures by number of bills enacted into law. The quality of the court decisions and the rationales for the decisions as documented in the opinion are the appropriate criteria. One great decision that breaks new ground, reconciles conflicts of laws, or settles an area of law is worth more than a larger number of “routine” decisions that are justified by more or less conventional lines of reasoning. Flango, supra, pág. 110.
Además, el “nuevo” Tribunal omite mencionar que el sis-tema apelativo de Mississippi diverge sustancialmente del nuestro, pues opera bajo el poco frecuente “deflective sys *131 tem” (vigente en sólo 2 estados más),(13) en el que todas las apelaciones del tribunal de primera instancia se presentan directamente en el Tribunal Supremo, el cual, bajo ciertos parámetros, puede transferir casos al foro apelativo intermedio. Véase Mississippi Rules of Appellate Procedure, Rule 16 (“All appeals from final orders of trial courts shall be filed in the Supreme Court and the Supreme Court shall assign cases, as appropriate, to the Court of Appeals”). Ello a diferencia de este Tribunal, que considera los casos presentados con el beneficio de una discusión co-legiada previa por parte del Tribunal de Apelaciones que facilita la disposición de los recursos.(14) El “nuevo” Tribunal opta así por comparar las chinas con la parcha, xana dulce y agradable y la otra, como sabemos, amarga.
B. El constitucionalista, Prof. José Julián Álvarez, nos indica: “[L]os estudios que existen sobre este tema en Es-tados Unidos y en Puerto Rico demuestran que el aumento en la composición de un tribunal colegiado puede significar más atraso [.]”J.J. Álvarez González, La nueva Ley de la Judicatura y la competencia obligatoria del Tribunal Su *132 premo: algunas jorobas de un solo camello, 65 (Núm. 1) Rev. Jur. U.P.R. 1, 29 esc. 177 (1996). Esto pues, aunque “[u]n aumento en el número de jueces podría significar más plumas a las que se pueden asignar la redacción de decisiones ... también significa más mentes que tendrían que consultarse sobre qué decidir y cómo decidirlo, lo que en ocasiones puede retrasar aún más el proceso decisional”. A.R. García Padilla y J. J. Álvarez González, El Tribunal Supremo de Puerto Rico: la Corte Pons, 59 (Núm. 2) Rev. Jur. U.P.R. 185, 226 esc. 121 (1990).
En este sentido, la División de Administración Judicial del American Bar Association ha comentado que incorpo-rar jueces adicionales incluso podría afectar la función de un Tribunal Supremo. Véase American Bar Association, op. cit., pág. 40 (“Adding judges to a highest court may actually slow down its operation rather than speed it up”).
Así lo articuló el propio Juez Presidente del Tribunal Supremo federal, Charles Evans Hughes, en momentos en que el presidente Franklin D. Roosevelt impulsaba el Court-packing plan para apoderarse del Tribunal Supremo federal por virtud de un aumento en su composición. En dicha ocasión, y como respuesta al argumento de que el retraso en el calendario del Tribunal Supremo federal re-quería aumentar el número de sus Jueces, el Juez Presi-dente Hughes, con el apoyo de los Jueces Asociados Van Devanter y Brandéis, expresó:
An increase in the number of Justices of the Supreme Court, apart from any question of policy, which I do not discuss, would not promote the efficiency of the Court. It is believed that it would impair that efficiency so long as the Court acts as a unit. There would be more judges to hear, more judges to confer, more judges to discuss, more judges to be convinced and to deride. Carta del Juez Presidente Charles Evans Hughes al senador Burton K. Wheeler (1937), reproducida en G. Gunther y K.M. Sullivan, Constitutional Law, 13ra ed., New York, The Foundation Press, 1997, pág. 184.
Los anteriores fundamentos llevaron al National Center *133 of State Courts a no recomendar un aumento de 7 a 9 jue-ces en el Tribunal Supremo de Nebraska como solución al problema de congestión en el calendario de dicho foro que se le había encomendado estudiar. Véase National Center for State Courts, The Nebraska Appellate System: A Review, pág. 28 (1989). En torno a este asunto explicó:
The decision-making process itself also would be affected by the addition of more judges. The process of reaching a decision in conference would be extended by the participation of the additional justices. Likewise, the process of obtaining a majority of the court in support of an opinion expressing the majority viewpoint would become more involved and time-consuming than with the present number of judges. And the fragile ingredient of collegiality would at least be diluted if not dispelled. íd., págs. 24-25.
Igual visión han expresado distintos jueces apelativos federales, quienes han resaltado las deficiencias de incor-porar jueces adicionales a un tribunal apelativo colegiado como remedio a la congestión de casos. Véase H.T. Edwards, The Rising Work Load and Perceived “Bureaucracy” of the Federal Courts: A Causation-Based Approach to the Search for Appropriate Remedies, 68 Iowa L. Rev. 871, 919 (1983) (“the impediments to collegiality that stem from the sheer number of members of the court reduce the overall quality of the court’s work product”); I.R. Kaufman, New Remedies For The Next Century Of Judicial Reform: Time As The Greatest Innovator, 57 Fordham L. Rev. 253, 257 (1988) (“Additional judgeships are both an inefficient use of scant judicial resources and a disruptive influence on the development of the law”).
Sobre el particular, el juez Gerald Bard Tjoflat, de la Corte de Apelaciones de Estados Unidos para el Undécimo Circuito, señaló:
Bigger is not always better. ... As the number of judges on an appellate court increases, the court evolves into what I call a “jumbo court.” [T]he dynamics of a jumbo court are such that, as the court grows larger, the productivity of individual *134 judges on the court declines. ... [E]ach addition undermines collegiality and reduces the efficiency of the court as a whole. ... Because large courts inevitably lose collegiality and efficiency in resolving disputes, productivity of all members of the court will decline, and, consequently, the contribution of each new judge is overstated. ... Anyone who has sat en banc on a jumbo court will tell you that it is an unpleasant, tiring and largely futile experience. Gerald Bard Tjoflat, More Judges, Less Justice: The Case Against Expansion of the Federal Judiciary, 79 A.B.A.J. 70, 70-72 (1993).
1 — I <
Como dijimos anteriormente, los miembros del “nuevo Tribunal proponen que se opere en sala una vez se au-mente el número de Jueces de nuestra plantilla. Para eva-luar esta propuesta conviene, nuevamente, repasar nues-tra experiencia histórica.
Para finales de la década de los años cincuenta la pre-sentación de casos ante este Tribunal experimentó un au-mento significativo. Ello, entre otros factores, contribuyó a que aumentase el atraso en este Tribunal. En 1958 la Asamblea Legislativa aprobó la Ley Núm. 115 de 26 de junio de 1958, para hacer discrecional la mayor parte de la jurisdicción apelativa del Tribunal Supremo y limitar la jurisdicción original de éste, como mecanismo para solven-tar la acumulación de casos ante el mismo.
Ello no obstante, y como nos recuerda Trías Monge, “[l]as medidas tomadas no aparecieron suficientes para conjurar el problema de congestión en los calendarios del Tribunal Supremo, con la resultante demora en la decisión de los casos en su fase apelativa, por lo que se procedió a enmendar la sección 4 del artículo V de la Constitución para facilitar aún más el funcionamiento en salas del Tribunal Supremo”. Trías Monge, El sistema judicial, op. cit., pág. 146. Esta enmienda hizo viable que, al elevarse el número de Jueces a 9, al año siguiente, se pudieran crear “hasta tres salas del Tribunal Supremo en momentos de necesidad”. Id.
*135 No cabe duda que cuando se presentó la propuesta del funcionamiento en salas en 1960, tuvo buena acogida por parte de la comunidad jurídica. Así se demostró en la vista pública de 20 de mayo de 1960, para considerar la Resolu-ción Concurrente del Senado Núm. 32: “Para proponer una enmienda a la Sección 4 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico: Funcionamiento del Tribunal Supremo.” Figuras prominentes, entre ellos el Lie. José Trías Monge y el Dr. Santos P. Amadeo, apoyaron la medida por considerarla una herramienta necesaria para enfrentar la situación de aquel momento.
El apoyo a esta enmienda a la Constitución, sin embargo, no fue unánime. El Lie. Francisco Ponsa Feliú com-pareció a la Legislatura a oponerse a la enmienda constitucional. En una ponencia preclara adelantó lo que ocurriría de operarse en salas. Explicó que al operar en salas se “sacrifica [ban] otros principios y otras nociones que son tan importantes por lo menos, si no más, que el problema de la congestión”. Vista Pública de 20 de mayo de 1960 para considerar R. Cone, del S. 32, pág. 13. Específi-camente, señaló que el funcionamiento en salas hacía viable que los derechos individuales de las personas se deci-dieran por el voto del exiguo número de dos Jueces, además de la amenaza que ello suponía para la estabilidad del régimen jurídico. Id., págs. 14-15. Esto último como resultado de que las decisiones emitidas por salas le resta-rían fuerza a la doctrina establecida, ante la probabilidad de que otra sala, enfrentándose a unos hechos similares, produzca un resultado distinto si no compartía el mismo criterio de la primera sala. La certeza de nuestros dictáme-nes, presupuesto imprescindible para la impartición de la justicia, cae rendida ante el sistema que hoy se glorifica.
Una vez implementado el sistema de las salas, inicial-mente se redujo el atraso en los casos pendientes de reso-lución ante el Tribunal Supremo. Con el tiempo los “bene-ficios” ganados no compensaban el perjuicio que produjo el *136 uso de las salas. Para empezar, el atraso regresó. Trías, que vivió esa época, nos señala lo siguiente: “Lo que existió por mucho tiempo fue una sucesión de opiniones sueltas no representativas del criterio del cuerpo. ... No había gran evidencia de que las opiniones publicadas habían sido ob-jeto de consideración a fondo por más de un magistrado.” J. Trías Monge, Cómo fue: memorias, San Juan, E.D.U.P.R., 2005, pág. 264. Tan es así, que describe la experiencia con “el sistema desprestigiado de salas” como aciaga, pues el Tribunal durante esta época “perdió su coherencia”. (Enfa-sis nuestro.) Id., pág. 264 — 265.
Así, “[u]na década después nadie se [mostró] satisfecho ni orgulloso de los resultados obtenidos. Resurge la crisis del abarrotamiento de casos. ... Incluso, dos salas resuel-ven el mismo punto de derecho de distinta manera. El mo-delo ideado para dispensar mejor la justicia ya no deslum-bra y llega a decepcionar hasta a aquellos quienes originalmente apoyaban la idea de las salas”. Rivera, op. cit., pág. 191. Quienes tuvieron el beneficio de observar de cerca el funcionamiento de las salas, recomiendan no mirar al pasado, sino buscar nuevas alternativas. Esta experien-cia desoladora es la que quiere emular el “nuevo” Tribunal. Quien no conoce su historia habrá de incurrir en los erro-res del pasado.
V
No existe razón legítima alguna para que los Jueces Asociados aquí proponentes soliciten aumentar la plantilla de este Foro. Se trata de un aumento que ya se probó (y se rechazó) y que resulta particularmente innecesario ante la existencia del Tribunal de Apelaciones, el cual brinda un alivio a nuestra carga apelativa que no estuvo disponible en tiempos anteriores.
Como se recordará, el fallido experimento de aumento a 9 jueces de 1961 ocurrió en momentos en que nuestro sis- *137 tema legal carecía de un foro apelativo intermedio. Con el establecimiento de las sesiones apelativas en el Tribunal Superior en 1974 (que sirvió de antesala al regreso a un Tribunal de 7 jueces por virtud de la legislación de 1975) se pudo desarrollar el camino para subsanar este vacío con la incorporación de un Tribunal de Apelaciones que hoy en día ha madurado lo suficiente como para “permitir que [este] Tribunal ... [pueda tener] mayor desahogo y [pueda servir] al máximo de agente en su función social de pautar e interpretar el derecho [así como] ayudar en la congestión de [nuestros] casos ...”. De Jesús Viñas v. González Lugo, 170 D.P.R. 499, 513-514 (2007). Véase Depto. de la Familia v. Shrivers Otero, 145 D.P.R. 351, 356-357 esc. 2 (1998).
Según advirtió la Comisión Asesora designada por el en-tonces Juez Presidente Señor Víctor M. Pons Núñez (en el informe que rindió en 1987 y que sirvió de base para los respectivos foros intermedios que favorecieron los entonces Gobernadores Sr. Rafael Hernández Colón y Sr. Pedro Ros-selló González), un tribunal apelativo intermedio permite reducir el atraso en los calendarios de los tribunales de última instancia y facilita el ejercicio de su función rectora de la doctrina. Véase Informe de la Comisión Asesora del Juez Presidente sobre la estructura y funcionamiento del Tribunal de Primera Instancia, 48 (Núm. 2) Rev. C. Abo. P.R. 5, 40-41 (1987).
Es por ello que el desarrollo de foros intermedios en las jurisdicciones estatales ha permitido revertir la composi-ción aumentada de 9 Jueces cada vez menos frecuente en los tribunales de última instancia. Así ocurrió, por ejemplo, en los Tribunales Supremos de Iowa y Minnesota al ver reducida sus respectivas composiciones de 9 a 7 Jueces con la ampliación o instauración de sus tribunales apelativos intermedios. Véanse: 1998 la. Ch. 1184; Act of Mar. 22, 1982, ch. 501, 1982 Minn. Laws 569.
Resulta, pues, realmente sorprendente que los cuatro recién nombrados compañeros Jueces Asociados tomen la *138 dirección opuesta al sentido común y la experiencia en los estados, y promuevan una petición de aumento justo ahora que contamos con la ayuda de un tribunal apelativo desa-rrollado que incluso es, numéricamente, superior a la in-mensa mayoría de los foros apelativos intermedios estatales.
Nótese que la Ley de la Judicatura de 2003 creó 6 plazas adicionales de jueces del Tribunal de Apelaciones, para un total de 39.(15) Con sus 39 jueces, Puerto Rico excede por mucho la mediana de 15 jueces apelativos intermedios que se calcula por estado. Véase Dept. of Justice, Bureau of Justice Statistics, State Court Organization, 1987-2004, pág. 4 (2007). De hecho, 11 estados ni tan siquiera tienen un tribunal apelativo intermedio(16) y, de los 39 que sí lo tienen, Puerto Rico supera a 32 en número de jueces. Véase Dept, of Justice, Bureau of Justice Statistics, State Court Organization 2004, págs. 12 — 14.
La petición de aumento de los Jueces proponentes es aún más difícil de entender, a la luz de parámetros jurídi-cos, si tomamos en cuenta que durante el año fiscal 2009 el Tribunal de Apelaciones resolvió 5,603 recursos, y que de éstos sólo 22.99% acudió en alzada antes nos. Véase Tribunal de Apelaciones, Estadísticas 2008-2009, pág. 21. Esto implica que nuestro sistema apelativo dispuso de 4,315 re-cursos sin comprometer el calendario de este Tribunal. El alivio que representó el foro intermedio para nuestra carga apelativa fue similar para años anteriores(17) y se perfila aún mayor ahora que se aprobaron las nuevas Reglas de *139 Procedimiento Civil que limitan significativamente los re-cursos en alzada de determinaciones interlocutorias del Tribunal de Primera Instancia. No hay, por lo tanto, justi-ficación alguna para el pedido de los recién nombrados Jueces.
VI
Unas reflexiones finales. Tras examinar las ya discuti-das lecciones de nuestra historia, los datos que recoge el Juez Presidente señor Hernández Denton, así como los “ar-gumentos” contenidos en la rauda Resolución del Tribunal, es forzoso concluir que la movida que hoy una mayoría del Tribunal realiza no responde a los mejores intereses de esta Institución. Por el contrario, actualmente todo indica que el número de jueces que lo integran debe permanecer inalterado. Además, y tal vez más importante, no se debe utilizar el mecanismo extraordinario de la Sección 3 del Artículo V de la Constitución, para resolver lo que son de-ficiencias subjetivas y no orgánicas.
La Resolución emitida por el Tribunal nos recuerda la consulta plebiscitaria que tuvo lugar en Puerto Rico du-rante la década de los noventa. En 1994, el Gobernador de Puerto Rico presentó un plan para reorganizar el sistema judicial del país, el cual fue objeto de serios señalamientos por parte de la academia y los diversos componentes de la comunidad jurídica en general ante sus evidentes deficiencias.(18) El referido plan fue criticado, en parte, por entender que con su implantación se pretendía utilizar la Rama Judicial como una ficha de juego más dentro de la ya lastimosa lucha política por el control absoluto de nuestras instituciones.
Ese mismo año, este Tribunal rechazó vehementemente *140 el mencionado plan de reorganización por múltiples razo-nes, entre éstas, por adolecer de serias deficiencias concep-tuales, no estar precedido por estudios empíricos adecua-dos y atentar contra los principios de independencia judicial y separación de poderes. Véase In re Reforma Judicial, 136 D.P.R. 1 (1994). De igual forma, sostuvimos fir-memente que era innecesario variar la composición del Tribunal Supremo. A esos efectos, indicamos: “Nuestra posición debe quedar clara, al efecto de que los cambios simplemente estructurales no constituyen de por sí una solución eficaz a los problemas de la administración judicial en Puerto Rico.” Id., pág. 2.
A pesar de nuestra oposición y la de la gran mayoría de la comunidad jurídica, la mal llamada reforma judicial fue aprobada bajo la Ley de la Judicatura de Puerto Rico de 1994, Ley Núm. 1 de 28 de julio de 1994. Sin embargo, académicos muy respetados llegaron a sugerir que el au-mento en la competencia original del Tribunal Supremo, según aprobado en la Ley de la Judicatura de 1994, no era sino un mecanismo de presión para tratar de llevar a este Tribunal a que solicitara un aumento en su composición. Véase J.J. Alvarez González, La nueva Ley de la Judica-tura, supra, págs. 27-28. Sin embargo, a los proponentes de aquella gesta les restaba alcanzar un cambio que sólo la Constitución impedía.
Es por ello que a sólo tres meses desde que este Tribunal se expresara sobre lo innecesario que resultaba aumen-tar su composición, la administración del gobierno de ese entonces —algunos de sus miembros sentados ahora en este Tribunal— impulsó la celebración de un referéndum en el que, entre otros asuntos, se le consultó al pueblo lo siguiente: primero, si la Constitución debía enmendarse para aumentar el número de Jueces Asociados del Tribunal Supremo a nueve, y segundo, si se debía suprimir el texto constitucional que delega en el referido organismo la facul- *141 tad exclusiva de solicitar una variación a su composición mediante ley. Ley Núm. 49 de 2 de agosto de 1994, cono-cida como “Ley Habilitadora del Referéndum sobre en-miendas a la Constitución de Puerto Rico de 1994”. Como sabemos, la ciudadanía rechazó todas y cada una de las enmiendas incluidas en la referida consulta. No obstante, hoy la mayoría de este Tribunal revisita el tema de la com-posición de nuestro Foro y pretende alcanzar bajo el manto de la Constitución, aquello que no se pudo mediante el voto popular. Tal proceder es inaceptable.
¿Qué motiva entonces la solicitud de una mayoría del Tribunal a los efectos de aumentar a nueve el número de Jueces de este Foro? La respuesta puede que haya sido revelada hace apenas un año: “Se trata del flujo normal de la marea judicial en una democracia, producto indirecto del mandato del Pueblo expresado donde corresponde, en las urnas.” Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230, 287 (2009) (Martínez Torres, J., Op. de conformidad).
Este reflujo, procedente de los pasados comicios electo-rales, sin duda, ha inundado al Tribunal. Ha sido esta ma-rea la que repetidamente ha guiado el criterio de la mayo-ría de este Foro a la hora de rendir su juicio en casos trascendentales para este país. Hoy no es la excepción. Sin embargo, nuevamente expreso mi más férrea oposición a semejante metodología adjudicativa. Como bien apuntó el Juez Asociado Negrón García, “[e]n un foro colegiado —como lo es este Tribunal— ... es natural y saludable la pluralidad de juicios y enfoques. Por ende, no tienen cabida criterios apriorísticos basados en un reclamo de solidari-dad institucional, y mucho menos la prevalencia de un mu-tismo individual sobre un asunto cardinal que directa-mente atañe a la eficiente administración de justicia: la independencia judicial”. (Enfasis suplido y en el original.) In re Reforma Judicial, supra, págs. 43-44 (Juez Asociado Negrón García, Voto separado, citando sus reflexiones en *142 ocasión de la juramentación de jueces del Tribunal de Pri-mera Instancia el 25 de enero de 1990).
El tiempo nos dirá si este vaivén judicial traerá consigo otras modificaciones —tal vez para reducir el número de jueces del Tribunal— a finales del año 2012, ante un resul-tado electoral desfavorable para ciertos sectores del país. Ello, aunque entonces se justifique con el “éxito” del au-mento a nueve Jueces, logrando disminuir la carga de tra-bajo y mejorar la eficiencia de la Institución, en realidad sería una forma burda de manipular nuestro Foro para impedir que la siguiente administración del gobierno pu-diera ejercer sus facultades constitucionales de nomina-ción y confirmación de Jueces y de darle curso a su pro-yecto de país.(19)
No albergo duda de que el atentado que autoriza una simple mayoría de esta Curia representa un retroceso en la historia de nuestro sistema político-democrático. Sus moti-vaciones, arterías y repercusiones tendrán que ser juzga-das por la historia de este Pueblo. Mi conciencia está tranquila.
Hoy, un día que vivirá en la infamia,(20) comienza el me-dioevo puertorriqueño.
¡QUÉ LÁSTIMA!

 J. Castán Tobeñas, Poder Judicial e Independencia Judicial, Madrid, Ed. Reus, 1951, pág. 41.

 Parafraseo así lo expresado por el Juez Asociado Stevens en su opinión disi-dente en Bush v. Gore, 531 U.S. 98, 129 (2000).

 Véase, con detenimiento y preocupación, Ingo Müller, Los juristas del horror, la “Justicia" de Hitler: el pasado que Alemania no puede dejar atrás, Bogotá, Ed. ABC Ltda., 2005.

 Este proceder ya ha generado desgaste en la percepción pública puertorri-queña sobre nuestra legitimidad como foro independiente. El Prof. Hiram Meléndez Juarbe comenta: “[H]oy la Rama Judicial se gradúa como una rama política, como todas las demás, y pierde irreparablemente la confianza pública necesaria para fun-gir como el garante de derechos y árbitro imparcial de controversias sociales y políticas.” H. Meléndez Juarbe, Dos más, 2 de noviembre de 2010, wvow.derechoalderecho.org (última visita 3 de noviembre de 2010).

 Véase P.D. Carrington y otros, “The Imperatives of Appellate Justice” en Justice on Appeal, St. Paul, West Publishing, 1976, págs. 7-12.

 Se arguye también que este aumento supone una mayor transparencia en los asuntos del Tribunal. Poco pueden predicar sobre transparencias quienes actúan en la noche.

 Véase 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2608-2615.

 Entre estos 5 estados se encuentran Texas y Oklahoma que, a diferencia del resto de los estados, tienen un segundo foro de última instancia para asuntos criminales. En el caso de Texas, sus dos foros de última instancia están compuestos por 9 jueces. En Oklahoma, por su parte, el Tribunal Supremo tiene 9 Jueces y la Corte de Apelaciones Criminales tiene 5 jueces. Véase National Center for State Courts, State Court Statistics: An Analysis of2007 State Court Caseloads, págs. 48 y 56 (2009); Dept. of Justice, Bureau of Justice Statistics, State Court Organization, 2004, págs. 12-14.

 El Tribunal Supremo federal actualmente está compuesto por 9 Jueces. Véase 28 U.S.C.A. sec. 1. Este número se ha mantenido fijo desde 1869. Véase 22 Moore’s Federal Practice — Civil 3rd Sec. 401.03.

 Véase National Center for State Courts, State Court Statistics: An Analysis of2007 State Court Caseloads, pág. 193.

 íd.

 íd.

 Para una discusión sobre el referido sistema, véase L.H. Southwick, The Mississippi Court of Appeals: History, Procedures, and First Year’s Jurisprudence, 65 Miss. L.J. 593, 615 (Í996) (“The basic idea of a deflective system is that a state’s highest court continues to have all appeals from trial courts filed with its clerk. Through a screening process, a decision is then made as to which cases the highest court will retain and which will be sent to the intermediate court”); National Center for State Courts, State of Iowa Supreme Court Organizational Assessment and Wor-kflow Review: Final Report, págs. 1 y 7 (2008) (“Aside from Iowa, only the states of Idaho and Mississippi currently utilize a deflective system. ... [In] a deflective system ... all appeals are filed directly with the Supreme Court which subsequently decides whether to retain or transfer each case”).

 Sobre las desventajas de un “deflective system”, véase W. William Leaphart, 25 Montana Lawyer 5 (2000) (“[In] a deflective system [the] Supreme Court must screen all cases that come before it and determine which cases it will keep and which cases to send or ‘deflect’ to the IAC [Intermediate Appellate Court]. In our view, the screening process is counterproductive. That is, it would require us to spend a considerable portion of our time screening which cases to send to the IAC — time we could just as easily spend deciding the cases in the first instance. Unless we were to delegate the screening process to staff attorneys (an unacceptable alternative in our view) the deflective model does not appear to be an efficient use of court or staff time”).

 Véanse: Arts. 4.003 y 8.001 de la Ley de la Judicatura de 2003 (4 L.P.R.A. secs. 24v y 25r).

 Se incluye en este cálculo a Dakota del Norte por no tener un foro apelativo intermedio permanente. Sobre el funcionamiento del “Temporary Court of Appeals” en la referida jurisdicción, véase: N.D. Cent. Code, Secs. 27-02.1-01 a 27-02.1-09; N.D. Sup. Ct. Admin. R. 27.

 Véanse, por ejemplo: Tribunal de Apelaciones, Estadísticas 2007-2008, pág. 18; Tribunal de Apelaciones, Estadísticas 2006-2007, pág. 19. Para periodos anterio-res, véase Informe General sobre el Tribunal Apelativo Intermedio: años Fiscales 1992-1993 al 2002-2003, pág. 11.

 Tan deficiente fue la Reforma del 1994, que apenas un año más tarde, hubo que reformar esa “reforma”. Véase Ley Núm. 248 de 25 de diciembre de 1995 (Parte 2) Leyes de Puerto Rico 1461.

 Véanse: B. Ackerman, Anatomy of a Constitutional Coup, 23 (Núm. 3) London Rev. Books (2001); P. Rivas Nieto, El golpe de Estado como forma de intervención política, (Núm. 6) Shera Pública 161-178 (2006); C. Malaparte, Técnicas de golpe de Estado: cómo los dictadores alcanzan el poder, (V. Guevara, trad.), Barcelona, Editorial Planeta, 2009.

 Franklin Delano Rosevelt, 8 de diciembre de 1941, Mensaje al Congreso de Estados Unidos.